UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| MARILYN RAE BASKIN and ESTHER FULLER; BONNIE EVERLY and LINDA JUDKINS; DAWN LYNN CARVER and PAMELA RUTH ELEASE EANES; HENRY GREENE and GLENN FUNKHOUSER, individually and as parents and next friends of C.A.G.; NIKOLE QUASNEY, and AMY SANDLER, individually and as parents and next friends of A.Q.-S. and M.Q.-S., | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| vs. | ) ) | 1:14-cv-00355-RLY-TAB |
| PENNY BOGAN, in her official capacity as BOONE COUNTY CLERK; KAREN M. MARTIN, in her official capacity as PORTER COUNTY CLERK; MICHAEL A. BROWN, in his official capacity as LAKE COUNTY CLERK; PEGGY BEAVER, in her official capacity as HAMILTON COUNTY CLERK; WILLIAM C. VANNESS II, M.D., in his official capacity as the COMMISSIONER, INDIANA STATE DEPARTMENT OF HEALTH; and GREG ZOELLER, in his official capacity as INDIANA ATTORNEY GENERAL, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

1

MIDORI FUJII; MELODY LAYNE and )
TARA BETTERMAN; )
SCOTT and Rodney MOUBRAY- )
CARRICO; MONICA WEHRLE and )
HARRIET MILLER; GREGORY )
HASTY and CHRISTOPHER VALLERO; )
ROB MACPHERSON and STEVEN )
STOLEN, individually and as parents and )
next friends of L. M.-C. and A. M.-S., )
)
        Plaintiffs, )
)
      vs. )    1:14-cv-00404-RLY-TAB
)
GOVERNOR, STATE OF INDIANA, in )
his official capacity; COMMISSIONER, )
INDIANA STATE DEPARTMENT OF )
HEALTH, in his official capacity; )
COMMISSIONER, INDIANA STATE )
DEPARTMENT OF REVENUE, in his )
official capacity; CLERK, ALLEN )
COUNTY, INDIANA, in her official )
capacity; CLERK, HAMILTON )
COUNTY, INDIANA, in her official )
capacity, )
)
       Defendants. )
)


OFFICER PAMELA LEE, CANDACE )
BATTEN-LEE, OFFICER TERESA )
WELBORN, ELIZABETH J. PIETTE, )
BATALLION CHIEF RUTH )
MORRISON, MARTHA LEVERETT, )
SERGEANT KAREN VAUGHN- )
KAJMOWICZ, TAMMY VAUGHN- )
KAJMOWICZ, and J. S. V., T. S. V., T. R. )
V., by their parents and next friends )
SERGEANT KAREN VAUGHN- )
KAJMOWICZ and TAMMY VAUGHN- )
KAJMOWICZ, )
)

2

|                                                                                                                                                                                                                                                                                                                                                                                                        |     |                          |
|---|---|---|
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | 1:14-cv-00406-RLY-MJD |
| | ) | |
| MIKE  PENCE, in his official capacity as | ) | |
| GOVERNOR OF THE STATE OF | ) | |
| INDIANA; BRIAN  ABBOTT, CHRIS | ) | |
| ATKINS, KEN  COCHRAN, STEVE | ) | |
| DANIELS, JODI  GOLDEN, MICHAEL | ) | |
| PINKHAM, KYLE  ROSEBROUGH, and | ) | |
| BRET  SWANSON, in their official | ) | |
| capacities as members of the Board of | ) | |
| Trustees of the Indiana Public Retirement | ) | |
| System; and STEVE  RUSSO, in his | ) | |
| official capacity as Executive Director of | ) | |
| the Indiana Public Retirement System, | ) | |
| | ) | |
| Defendants. | ) | |

## ENTRY ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

The court has before it three cases, *Baskin v. Bogan*, *Fujii v. Pence*, and *Lee v. Pence*.  All three allege that Indiana Code Section 31-11-1-1 ("Section 31-11-1-1"), which defines marriage as between one man and one woman and voids marriages between same-sex persons, is facially unconstitutional.  Plaintiffs in the *Baskin* and *Fujii* cases challenge the entirety of Section 31-11-1-1, while Plaintiffs in the *Lee* case challenge only Section 31-11-1-1(b).  Plaintiffs, in all three cases, allege that Section 31-11-1-1 violates their rights to due process and equal protection under the Fourteenth Amendment of the United States Constitution.  In each case, Plaintiffs seek declaratory and injunctive relief against the respective Defendants.  Also in each case, Plaintiffs and Defendants have moved for summary judgment, agreeing that there are no issues of

material fact.  For the reasons set forth below, the court finds that Indiana's same sex marriage ban violates the due process clause and equal protection clause and is, therefore, unconstitutional.  The court **GRANTS in part and DENIES in part** the Plaintiffs' motions for summary judgment and **GRANTS in part and DENIES in part** the Defendants' motions.

## I.    Background

### A.    The *Baskin* Plaintiffs

The court considers the case of *Baskin v. Bogan* to be the lead case and thus will recite only those facts relevant to that dispute.  In *Baskin v. Bogan*, Plaintiffs are comprised of five same-sex couples and three minor children of two of the couples. (Amended Complaint ¶ 1, Filing No. 30).[1]  Four couples, Marilyn Rae Baskin and Esther Fuller, Bonnie Everly and Linda Judkins, Dawn Carver and Pamela Eanes, Henry Greene and Glenn Funkhouser (collectively the "unmarried plaintiffs"), are not married; one couple, Nikole Quasney and Amy Sandler (collectively the "married plaintiffs"), married in Massachusetts while on their annual vacation to the Sandler family home.  Each couple resides in Indiana and has been in a loving, committed relationship for over a decade. Each couple has their own set of fears and concerns should something happen to his or her significant other.

Plaintiffs challenge Section 31-11-1-1, which states:

(a) Only a female may marry a male. Only a male may marry a female.
(hereinafter "Section A")

---

[1] Filing Numbers will refer to those documents in *Baskin v. Bogan* unless stated otherwise.

(b) A marriage between persons of the same gender is void in Indiana even if the marriage is lawful in the place where it is solemnized. (hereinafter "Section B")

In addition, Plaintiffs broadly challenge other Indiana statutes that have the effect of carrying out the marriage ban. (hereinafter, collectively, with Section 31-11-1-1, referred to as "Indiana's marriage laws").  On April 10, 2014, the court granted a temporary restraining order (Filing No. 51) prohibiting the *Baskin* Defendants from enforcing Section B against Nikole Quasney and Amy Sandler.  The parties in *Baskin* agreed to fully brief their motions for preliminary injunction and summary judgments for a combined hearing held on May 2, 2014.  The court granted a preliminary injunction extending the temporary restraining order.  (Filing No. 65).  The court now considers the cross motions for summary judgment in the three cases.

### B.      Indiana's Marriage Laws

In order to marry in the State of Indiana, a couple must apply for and be issued a marriage license.  *See* Ind. Code § 31-11-4-1.  The couple need not be residents of the state.  *See* Ind. Code § 31-11-4-3.  However, the two individuals must be at least eighteen years of age or meet certain exceptions.  *See* Ind. Code § 31-11-1-4; Ind. Code § 31-11-1-5.  An application for a marriage license must include information such as full name, birthplace, residence, age, and information about each person's parents.  *See* Ind. Code § 31-11-4-4.[2]  The application only has blanks for information from a male and female applicant.  *See* Marriage License Application, *available at*

---

[2] The State Department of Health is charged under Ind. Code § 31-11-4-4(c) with developing a uniform application for marriage licenses.

www.in.gov/judiciary/2605.htm.  It is a Class D Felony to provide inaccurate information in the marriage license or to provide inaccurate information about one's physical condition.[3]  *See* Ind. Code § 31-11-11-1; Ind. Code § 31-11-11-3.  The clerk may not issue a license if an individual has been adjudged mentally incompetent or is under the influence of alcohol or drugs.  *See* Ind. Code § 31-11-4-11.

The marriage license serves as the legal authority to solemnize a marriage.  *See* Ind. Code § 31-11-4-14.  The marriage may be solemnized by religious or non-religious figures.  *See* Ind. Code § 31-11-6-1.  If an individual attempts to solemnize a marriage in violation of Indiana Code Chapter 31-11-1, which includes same-sex marriages, then that person has committed a Class B Misdemeanor.  *See* Ind. Code § 31-11-11-7.

In addition to prohibiting same-sex marriages, Indiana prohibits bigamous marriages and marriages between relatives more closely related than second cousins unless they are first cousins over the age of sixty-five.  *See* Ind. Code § 31-11-1-2 (cousins); *see* Ind. Code § 31-11-1-3 (polygamy).  Nevertheless, when evaluating the legality of marriages, the Indiana Supreme Court found that "the presumption in favor of matrimony is one of the strongest known to law."  *Teter v. Teter*, 101 Ind. 129, 131-32 (Ind. 1885).  In general, Indiana recognizes out-of-state marriages that were valid in the

---

[3] In an official opinion concerning the authority of clerks to issue marriage licenses and only referencing one occasion where they cannot –same-sex marriages, the Attorney General appeared to consider inaccurate physical information to include gender.  *See* 2004 Ind. Op. Att'y Gen. No. 4 (Apr. 29, 2004).  The Attorney General noted that a clerk can be charged with a misdemeanor for issuing a marriage license knowing the information concerning the physical condition of the applicant is false.  *See id.*

location performed.  *Bolkovac v. State,* 98 N.E.2d 250, 304 (Ind. 1951) ("[t]he validity of a marriage depends upon the law of the place where it occurs.").

## II.    Summary Judgment Standard

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  Summary judgment is appropriate if the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  A genuine issue of material fact exists if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party on the particular issue.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

On a motion for summary judgment, the burden rests with the moving party to demonstrate "that there is an absence of evidence to support the nonmoving party's case."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  After the moving party demonstrates the absence of a genuine issue for trial, the responsibility shifts to the non-movant to "go beyond the pleadings" and point to evidence of a genuine factual dispute precluding summary judgment.  *Id*. at 322-23.  "If the non-movant does not come forward with evidence that would reasonably permit the finder of fact to find in her favor on a material question, then the court must enter summary judgment against her."  *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994) (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 585-87); *see Celotex*, 477 U.S. at 322-24; *see also Anderson*, 477 U.S. at 249-52.

Prior to discussing the merits of the summary judgment motions, the court must decide several threshold issues.  First, the court must determine whether Defendants Attorney General Zoeller, Governor Pence, and the Commissioner of the Indiana State Department of Revenue ("Department of Revenue Commissioner") are proper parties, and second, whether *Baker v. Nelson*, 409 U.S. 810 (1972) bars the present lawsuit.

## III.   Proper Party-Defendants

Under the Eleventh Amendment, a citizen cannot sue their state in federal court unless the state consents.  However, the Supreme Court created an important exception to that immunity in *Ex Parte Young*.  209 U.S. 123 (1908).  Under that doctrine, "a private party can sue a state officer in his or her official capacity to enjoin prospective action that would violate federal law."  *Ameritech Corp. v. McCann*, 297 F.3d 582, 585-86 (7th Cir. 2002)(quoting *Dean Foods Co. v. Brancel*, 187 F.3d 609, 613 (7th Cir. 1999)).  Because Plaintiffs seek an injunction to enjoin actions which violate federal law, *Ex Parte Young* applies.  The question here rather, is who is a proper defendant?

The proper defendants are those who bear "'legal responsibility for the flaws [plaintiffs] perceive in the system' and not one[s] from whom they 'could not ask anything . . . that could conceivably help their cause.'"  *Sweeney v. Daniels*, No. 2:12-cv-81-PPS/PRC, 2013 WL 209047, * 3 (N.D. Ind. Jan. 17, 2013) (quoting *Hearne v. Bd. of Educ.*, 185 F.3d 770, 777 (7th Cir. 1999)).  Defendants Zoeller, Pence, and the Department of Revenue Commissioner assert that they are not the proper parties.  For the reasons explained below, the court agrees with Governor Pence and disagrees with Attorney General Zoeller and the Department of Revenue Commissioner.

8

A.     **Defendant Zoeller**

Defendant Zoeller, sued in *Baskin v. Bogan*, asserts that he neither has the authority to enforce nor has any other role respecting Section 31-11-1-1 as the Attorney General.  However, the *Baskin* Plaintiffs' complaint broadly challenges Section 31-11-1-1 and the State's other laws precluding such marriages, and requests that the court declare Section 31-11-1-1 "and all other sources of Indiana law that preclude marriage for same-sex couples or prevent recognition of their marriages" unconstitutional.  (Amended Complaint §§ 3, 80, Filing No. 30, at ECF p. 2, 26).  This relief would encompass such criminal statutes as listed above in Part I.B.

The Attorney General has the broad authority to assist in the prosecution of any offense if he decides that it is in the public interest.  *See* Ind. Code. § 4-6-1-6.  Noting this broad authority, the court has previously found that the Attorney General is a proper party when challenging statutes regarding abortion.  *See Arnold v. Sendak*, 416 F. Supp. 22, 23 (S.D. Ind. 1976), *aff'd*, 429 U.S. 476 (1976) (finding "[t]he Attorney General thus has broad powers in the enforcement of criminal laws of the state, and is accordingly a proper defendant."); *see also Gary-Northwest Indiana Women's Services, Inc. v. Bowen*, 496 F. Supp. 894 (N.D. Ind. 1980) (attorney general as a party to a law challenging statute criminalizing abortion).  Although Section 31-11-1-1 does not specifically define criminal penalties, Indiana has criminal provisions in place to prevent individuals from marrying in violation of it.  *See* Ind. Code §§ 31-11-11-7; 31-11-11-1; and 31-11-11-13. Because the Attorney General has broad powers in the enforcement of such criminal statutes, he has a sufficient connection and role in enforcing such statutes for purposes of

9

*Ex Parte Young*.  209 U.S. at 157.  Therefore, the court **DENIES** the Attorney General's motion for summary judgment on that ground. (Filing No. 55).

## B.      Governor Pence

Governor Pence is sued in the *Fujii* and *Lee* cases.  As the court found in *Love v. Pence*, another case challenging the constitutionality of Section 31-11-1-1, the Governor is not a proper party because the Plaintiffs' injuries are not fairly traceable to him and cannot be redressed by him.  (*Love v. Pence*, No. 4:14-cv-15-RLY-TAB, Filing No. 32 (S.D. Ind. June 24, 2014).  Therefore, the court **GRANTS** the Governor's motions for summary judgment (*Fujii* Filing No. 44) (*Lee* Filing No. 41).

## C.      Commissioner of the Indiana State Department of Revenue

The *Fujii* Plaintiffs also brought suit against the Department of Revenue Commissioner.  The Commissioner claims he is the wrong party because any harms caused by him do not constitute a concrete injury.  The court disagrees and finds that Plaintiffs have alleged a concrete injury by having to fill out three federal tax returns in order to file separate returns for Indiana.  *See e.g. Harris v. City of Zion, Lake County, Ill.*, 927 F.2d 1401, 1406 (7th Cir. 1991) ("[a]n identifiable trifle is enough for standing to fight out a question of principle; the trifle is the basis for standing and the principle supplies the motivation.").  The court finds that this is an identifiable trifle.  Therefore, the court **DENIES** the Department of Revenue Commissioner's motion for summary judgment on that ground.  (*Fujii* Filing No. 44).

## IV.  The Effect of *Baker v. Nelson*

Defendants argue that this case is barred by *Baker v. Nelson*.  In *Baker*, the United States Supreme Court dismissed an appeal from the Supreme Court of Minnesota for want of a substantial federal question.  409 U.S. at 810.  The Supreme Court of Minnesota held that: (1) the absence of an express statutory prohibition against same-sex marriages did not mean same-sex marriages are authorized, and (2) state authorization of same-sex marriages is not required by the United States Constitution.  *Baker v. Nelson*, 191 N.W.2d 185 (Minn. 1971), *aff'd*, 409 U.S. 810 (1972).

The parties agree that the Supreme Court's ruling has the effect of a ruling on the merits.  *See Ill. Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 182-83 (1979) ("a summary disposition affirms only the judgment of the court below, and no more may be read into [the] action than was essential to sustain the judgment.").  Defendants contend that this case raises the precise issue addressed by *Baker* and thus binds the court to find in Defendants' favor.  *See Hicks v. Miranda*, 422 U.S. 332, 344-45 (1975) (quotation omitted) ("the lower courts are bound . . . until such time as the [Supreme] Court tells them that they are not.").

The court agrees that the issue of whether same-sex couples may be constitutionally prohibited from marrying is the exact issue presented in *Baker*.  Nevertheless, the Supreme Court created an important exception that "when doctrinal developments indicate," lower courts need not adhere to the summary disposition.  *Id.*  Plaintiffs argue that three decisions in particular are such developments: *Romer v. Evans*,

517 U.S. 620 (1996), *Lawrence v. Texas*, 539 U.S. 558 (2003), and *United States v. Windsor*, 133 S. Ct. 2675 (2013), and thus, the court no longer must adhere to *Baker*.

The Supreme Court decided *Baker* at a different time in the country's equal protection jurisprudence.  The following are examples of the jurisprudence at and around the time of *Baker*.  The Court struck down a law for discriminating on the basis of gender for the first time only one year before *Baker*.  *Reed v. Reed*, 404 U.S. 71 (1971). Moreover, at the time *Baker* was decided, the Court had not yet recognized gender as a quasi-suspect classification.  Regarding homosexuality, merely four years after *Baker*, the Supreme Court granted a summary affirmance in a case challenging the constitutionality of the criminalization of sodomy for homosexuals.  *Doe v. Commonwealth's Attorney for City of Richmond*, 425 U.S. 901 (1976).  Thus, the Supreme Court upheld the district court's finding that "[i]t is enough for upholding the legislation that the conduct is likely to end in a contribution to moral delinquency."  *Doe v. Commonwealth's Attorney for City of Richmond*, 403 F. Supp. 1199, 1202 (E.D. Va. 1975), *aff'd* 425 U.S. 901 (1976). Nine years later in 1985, the Eleventh Circuit found that particular summary affirmance was no longer binding.  *Hardwick v. Bowers*, 760 F.2d 1202 (11th Cir. 1985), *rev'd* 478 U.S. 186 (1986).  However, on review, the Supreme Court held that states were permitted to criminalize private, consensual sex between adults of the same-sex based merely on moral disapproval.  *See Bowers v. Hardwick*, 478 U.S. 186 (1986), *overruled by Lawrence*, 539 U.S. at 578.  For ten more years, states were free to legislate against homosexuals based merely on the majority's disapproval of such conduct.

Then in 1996, the Supreme Court decided *Romer* – the first case that clearly shows a change in direction away from *Baker*.  The Court held that an amendment to the Colorado Constitution, specifically depriving homosexual persons from the protection of anti-discrimination measures, violated the Equal Protection Clause.  *Romer*, 517 U.S. at 635.  The next change occurred in 2003 with *Lawrence* when the Supreme Court overruled *Bowers*, finding that the promotion of morality is not a legitimate state interest under the Equal Protection Clause and the state may not criminalize sodomy between individuals of the same sex.  *Lawrence*, 539 U.S. at 582.

Finally, in the last year even more has changed in the Supreme Court's jurisprudence shedding any doubt regarding the effect of *Baker*.  The Supreme Court granted certiorari for two cases involving the constitutionality of laws adversely affecting individuals based on sexual orientation.  First, in *United States v. Windsor*, the Supreme Court invalidated Section 3 of The Defense of Marriage Act ("DOMA"), which defined marriage for purposes of federal law as "only a legal union between one man and one woman."  133 S. Ct. at 2694 (quoting 1 U.S.C. § 7).  The Court noted that the differentiation within a state caused by DOMA "demeans the couple, whose moral and sexual choices the Constitution protects."  *Windsor*, 133 S. Ct. at 2694.  Additionally, the Court found that the purpose of DOMA "is to ensure that if any State decides to recognize same-sex marriages, those unions will be treated as second-class marriages."  *Id.* at 2693.  Second, the Supreme Court dismissed an appeal of California's prohibition on same-sex marriages, not because *Baker* rendered the question insubstantial, but because the law's supporters lacked standing to defend it.  *Hollingsworth v. Perry*, 133 S.

13

Ct. 6252 (2013).  These developments strongly suggest, if not compel, the conclusion that *Baker* is no longer controlling and does not bar the present challenge to Indiana's laws. *See Windsor v. United States*, 699 F.3d 169, 178 (2d Cir. 2012), *aff'd*, 133 S. Ct. 2675 (2013) (holding that *Baker* was not controlling as to the constitutionality of DOMA, reasoning that "[i]n the forty years after *Baker*, there have been manifold changes to the Supreme Court's equal protection jurisprudence" and that "[e]ven if *Baker* might have had resonance . . . in 1971, it does not today").

The court acknowledges that this conclusion is shared with all other district courts that have considered the issue post-*Windsor.  See Wolf v. Walker*, No. 3:14-cv-00064-bbc, 2014 WL 2558444, ** 3-6 (W.D. Wisc. June 6, 2014);  *Whitewood v. Wolf*, No. 1:13-cv-1861, 2014 WL 2058105, ** 4-6  (M.D. Penn. May 20, 2014); *Geiger v. Kitzhaber*, No. 6:13-cv-01834-MC, 2014 WL 2054264, *1 n. 1 (D. Or. May 19, 2014); *Latta v. Otter*, 1:13-cv-482-CWD, 2014 WL 1909999, ** 7-10 (D. Idaho May 13, 2013); *DeBoer v. Snyder*, 973 F. Supp. 2d 757, 773 n. 6 (E.D. Mich. 2014); *DeLeon v. Perry*, 975 F. Supp. 2d 632, 648 (W.D. Tex. 2014) (order granting preliminary injunction); *Bostic v. Rainey*, 970 F. Supp. 2d 456, 469-70 (E.D. Va. 2014); *Bishop v. U.S. ex rel. Holder*, 962 F. Supp. 2d 1252, 1274-77 (N.D. Okla. 2014); *McGee v. Cole*, No. 3:13-cv-24068, 2014 WL 321122, ** 8-10 (S.D.W. Va. Jan. 29, 2014); *Kitchen v. Herbert*, 961 F. Supp. 2d 1181, 1195 (D. Utah 2013).  Finding that *Baker* does not bar the present action, the court turns to the merits of Plaintiffs' claims.

14

## V.      Right to Marry Whom?

As the court has recognized before, marriage and domestic relations are traditionally left to the states; however, the restrictions put in place by the state must comply with the United States Constitution's guarantees of equal protection of the laws and due process.  *See Windsor*, 133 S. Ct. at 2691 (citing *Loving v. Virginia,* 388 U.S. 1 (1967)).  Plaintiffs assert that Indiana's marriage laws violate those guarantees.

### A.      Due Process Clause

#### 1.      Fundamental Right

The Due Process Clause of the Fourteenth Amendment guarantees that no state shall "deprive any person of life, liberty, or property without the due process of law." U.S. Const. amend. XIV § 1.  The purpose of the Due Process Clause is to "protect[] those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty . . . ." *Washington v. Glucksburg*, 521 U.S. 702, 720-21 (1997) (quotations and citations omitted).  Because such rights are so important, "an individual's fundamental rights may not be submitted to vote."  *DeLeon*, 975 F. Supp. 2d at 657 (citing *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 638 (1943)).  Plaintiffs assert that the State of Indiana impedes upon their fundamental right to marry, and thus, violates the Due Process Clause.

The parties agree that a fundamental right to marry exists; however they dispute the scope of that right.  The fact that the right to marry is a fundamental right, although not explicitly stated by the Supreme Court, can hardly be disputed.  *See, e.g., Zablocki v.*

15

*Redhail*, 434 U.S. 374, 384 (1978) ("[D]ecisions of this Court confirm that the right to marry is of fundamental importance for all individuals."); *United States v. Kras,* 409 U.S. 434, 446 (1973) (concluding the Court has come to regard marriage as fundamental); *Loving*, 388 U.S. at 12 ("The freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men."); *Skinner v. Okla. ex. rel. Williamson*, 316 U.S. 535 (1942) (noting marriage is one of the basic civil rights of man fundamental to our existence and survival); *Maynard v. Hill*, 125 U.S. 190, 205 (1888) (characterizing marriage as "the most important relation in life" and as "the foundation of the family and society, without which there would be neither civilization nor progress."). Additionally, the parties agree that the right to marry necessarily entails the right to marry the person of one's choice. *See Lawrence*, 539 U.S. at 574 (2003) ("Our laws and tradition afford constitutional protection to personal decisions relating to marriage, procreation, contraception, family relationships, child rearing, and education.").

Defendants, relying on *Glucksberg*, argue that the fundamental right to marry should be limited to its traditional definition of one man and one woman because fundamental rights are based in history. The concept of same-sex marriage is not deeply rooted in history; thus, according to Defendants, the Plaintiffs are asking the court to recognize a new fundamental right. Plaintiffs counter that Defendants' reliance on *Glucksberg* is mistaken because the Supreme Court has repeatedly defined the fundamental right to marry in broad terms.

16

The court agrees with Plaintiffs.  "Fundamental rights, once recognized, cannot be denied to particular groups on the ground that these groups have historically been denied those rights."  *In re Marriage Cases*, 183 P.3d 384, 430 (Cal. 2008) (superseded by constitutional amendment).  In fact, "the history of our Constitution . . . is the story of the extension of constitutional rights and protections to people once ignored or excluded."  *United States v. Virginia*, 518 U.S. 515, 557 (1996).  The reasoning in *Henry v. Himes* is particularly persuasive on this point:

> The Supreme Court has consistently refused to narrow the scope of the fundamental right to marry by reframing a plaintiff's asserted right to marry as a more limited right that is about the characteristics of the couple seeking marriage. . .  **[T]he Court consistently describes a general 'fundamental right to marry' rather than 'the right to interracial marriage,' 'the right to inmate marriage,' or 'the right of people owing child support to marry.'**

No.1:14-cv-129, 2014 WL 1418395, *7 (S.D. Ohio Apr. 14, 2014) (emphasis added) (citing *Loving*, 388 U.S. at 12; *Turner v. Safley*, 482 U.S. 78, 94-96 (1987); *Zablocki*, 434 U.S. at 383-86).

The court finds *Loving v. Virginia* best illustrates that concept.  In that case, the Court held that Virginia's ban on interracial marriage violated the plaintiffs' rights under the Due Process Clause.  388 U.S. at 12.  The *Loving* Court stated "[t]he freedom to marry has long been recognized as one of the vital personal rights essential to the orderly pursuit of happiness by free men," and further recognized that, "marriage is one of the 'basic civil rights of man.'"  *Id.*  If the Court in *Loving* had looked only to the "traditional" approach to marriage prior to 1967, the Court would not have recognized that there was a fundamental right for Mildred and Richard Loving to be married,

because the nation's history was replete with statutes banning interracial marriages between Caucasians and African Americans.  Notably, the Court did not frame the issue of interracial marriage as a "new" right, but recognized the fundamental right to marry regardless of that "traditional" classification.

Unfortunately, the courts have failed to recognize the breadth of our Due Process rights before in cases such as *Bowers*.  478 U.S. at 186,  *overruled by Lawrence*, 539 U.S. at 578.  There, the court narrowly framed the issue as "whether the Federal Constitution confers a fundamental right upon homosexuals to engage in sodomy . . . ."  *Id.* at 190.  Not surprisingly, with the issue framed so narrowly and applying only to a small classification of people, the Court found that there was no fundamental right at issue because our history and tradition proscribed such conduct.  *Id.* at 192-94.  In 2003, the Supreme Court recognized its error and reversed course.  *Lawrence*, 539 U.S. at 567 (finding that the *Bowers* Court's statement of the issue "discloses the Court's own failure to appreciate the extent of the liberty interest at stake.").  The court found that the sodomy laws violated plaintiffs' Due Process right to engage in such conduct and intruded into "the personal and private life of the individual."  *Id.* at 578.  Notably, the Court did not limit the right to a classification of certain people who had historical access to that right.

Here, Plaintiffs are not asking the court to recognize a new right; but rather, "[t]hey seek 'simply the same right that is currently enjoyed by heterosexual individuals: the right to make a public commitment to form an exclusive relationship and create a family with a partner with whom the person shares an intimate and sustaining emotional

bond.'" *Bostic*, 970 F. Supp. 2d at 472 (quoting *Kitchen*, 961 F. Supp. 2d at 1202-03). The courts have routinely protected the choices and circumstances defining sexuality, family, marriage, and procreation. As the Supreme Court found in *Windsor*, "[m]arriage is more than a routine classification for purposes of certain statutory benefits," and "[p]rivate, consensual intimacy between two adult persons of the same sex . . . can form 'but one element in a personal bond that is more enduring.'" *Windsor*, 133 S. Ct. at 2693 (quoting *Lawrence*, 539 U.S. at 567). The court concludes that the right to marry should not be interpreted as narrowly as Defendants urge, but rather encompasses the ability of same-sex couples to marry.

## 2. Level of Scrutiny

The level of scrutiny describes how in depth the court must review the Defendants' proffered reasons for a law. Scrutiny ranges from rational basis (the most deferential to the State) to strict scrutiny (the least deferential to the State). Defendants agree that if the court finds that the fundamental right to marry encompasses same-sex marriages, then heightened scrutiny is appropriate. (Transcript 40:9-17). "When a statutory classification significantly interferes with the exercise of a fundamental right, it cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki*, 434 U.S. at 388. Strict scrutiny requires the government to show that the law is narrowly tailored to a compelling government interest. *See id.* The burden to show the constitutionality of the law rests with the Defendants. *See id.*

For strict scrutiny to be appropriate, the court must find: (1) there is a fundamental right, and (2) the classification significantly interferes with the exercise of that right. *Id.* First, as stated above, the court finds that the fundamental right to marry includes the right of the individual to marry a person of the same sex. Second, Section 31-11-1-1 significantly interferes with that right because it completely bans the Plaintiffs from marrying that one person of their choosing. Therefore, Indiana's marriage laws are subject to strict scrutiny. *See Bostic*, 970 F. Supp. 2d at 473.

### 3. Application

Section 31-11-1-1, classifying same-sex couples, "cannot be upheld unless it is supported by sufficiently important state interests and is closely tailored to effectuate only those interests." *Zablocki*, 434 U.S. at 388. Here, Defendants proffer that the state's interest in conferring the special benefit of civil marriage to only one man and one woman is justified by its interest in encouraging the couple to stay together for the sake of any unintended children that their sexual union may create. The court does not weigh whether or not this is a sufficiently important interest, but will assume that it is.

Defendants have failed to show that the law is "closely tailored" to that interest. Indiana's marriage laws are both over- and under-inclusive. The marriage laws are under-inclusive because they only prevent one subset of couples, those who cannot naturally conceive children, from marrying. For example, the State's laws do not consider those post-menopausal women, infertile couples, or couples that do not wish to have children. Additionally, Indiana specifically allows first cousins to marry once they reach the age that procreation is not a realistic possibility. *See* Ind. Code § 31-11-1-2.

20

On the other hand, Indiana's marriage laws are over-inclusive in that they prohibit some opposite-sex couples, who can naturally and unintentionally procreate, from marriage. For example, relatives closer in degree than second cousins can naturally and unintentionally procreate; however, they still may not marry.[4]  Most importantly, excluding same-sex couples from marriage has absolutely no effect on opposite-sex couples, whether they will procreate, and whether such couples will stay together if they do procreate.  Therefore, the law is not closely tailored, and the Defendants have failed to meet their burden.

The state, by excluding same-sex couples from marriage, violates Plaintiffs' fundamental right to marry under the Due Process Clause.  *See Wolf*, 2014 WL 2558444, at * 21; *Lee v. Orr*, No. 1:13-cv-08719, 2014 WL 683680, * 2 (N.D. Ill. Feb. 21, 2014) ("This Court has no trepidation that marriage is a fundamental right to be equally enjoyed by all individuals of consenting age regardless of their race, religion, or sexual orientation."); *Whitewood*, 2014 WL 2058105 at ** 8-9; *Latta*, 2014 WL 1909999 at * 13; *DeLeon*, 975 F. Supp. 2d at 659; *Bostic*, 970 F. Supp. 2d at 483; *Kitchen*, 961 F. Supp. 2d at 1204.

### B.    Equal Protection Clause

Plaintiffs also argue that Section 31-11-1-1 violates the Fourteenth Amendment's Equal Protection Clause.  The Equal Protection Clause "commands that no State shall 'deny to any person within its jurisdiction the equal protection of the laws,' which is

---

[4] The court does not evaluate the constitutionality of such laws, but merely uses this example to show that the present law would be over-inclusive in regard to Defendants' stated reason for marriage.

essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center, Inc.*, 473 U.S. 432, 439 (1985) (quoting U.S. Const., amend. XIV., § 1). The clause must take into account the fact that governments must draw lines between people and groups. *See Romer*, 517 U.S. at 631.

### 1.     Level of Scrutiny

"[I]f a law neither burdens a fundamental right nor targets a suspect class, [the court] will uphold the legislative classification so long as it bears a rational relation to some legitimate end." *Romer*, 517 U.S. at 631. The court must "insist on knowing the relation between the classification adopted and the object to be attained." *Id.* at 632. This is to ensure that the classification was not enacted for the purpose of disadvantaging the group burdened by the law. *See id.* at 633. If a law "impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class" then the court applies strict scrutiny. *See Zablocki*, 434 U.S. at 383. To survive strict scrutiny, Indiana must show that the law is narrowly tailored to a compelling government interest. *See id.* at 388. As indicated in Part V.A. above, the court finds that the law impermissibly interferes with a fundamental right, and Defendants failed to satisfy strict scrutiny. Nevertheless, the court will evaluate the Equal Protection claim independent from that conclusion and as an alternative reason to find the marriage law unconstitutional.

### a.     Form of Discrimination

Plaintiffs argue that Indiana's marriage laws discriminate against individuals on the basis of gender and sexual orientation.

### i.       Gender

According to Plaintiffs, Indiana's marriage laws discriminate against them based on their gender.  For example, if Rae Baskin was a man she would be allowed to marry Esther Fuller; however, because she is a female, she cannot marry Esther.  Additionally, Plaintiffs allege the law enforces sex stereotypes, requiring men and women to adhere to traditional marital roles.  *See e.g., J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994).  Defendants respond that the laws do not discriminate on the basis of gender because the laws do not affect any gender disproportionately.  Plaintiffs respond that a mere equal application of the law was rejected by the Court in *Loving*.

The court is not persuaded by Plaintiffs' arguments and finds *Loving* to be distinguishable on this point.  Unlike *Loving*, where the court found evidence of an invidious racial discrimination, the court finds no evidence of an invidious gender-based discrimination here.  *See Geiger*, 2014 WL 2054264 at * 7.  Moreover, there is no evidence that the purpose of the marriage laws is to ratify a stereotype about the relative abilities of men and women or to impose traditional gender roles on individuals.  *See id.*; *see also Bishop*, 962 F. Supp. 2d at 1286.

### ii.       Sexual Orientation

Plaintiffs also argue that Indiana's marriage laws classify individuals based on their sexual orientation, because they prevent all same-sex couples from marrying the person of their choice.  Defendants respond that the marriage laws do not discriminate against same-sex couples because they may marry just like opposite-sex couples may marry; the law merely impacts them differently.  The court rejects this notion.  As the

court stated above, the right to marry is about the ability to form a partnership, hopefully lasting a lifetime, with that one special person of your choosing.  Additionally, although Indiana previously defined marriage in this manner, the title of Section 31-11-1-1 – "Same sex marriages prohibited" – makes clear that the law was reaffirmed in 1997 not to define marriage but to prohibit gays and lesbians from marrying the individual of their choice.  Thus, the court finds that Indiana's marriage laws discriminate based on sexual orientation.

### b.     Level of Scrutiny

The Seventh Circuit applies rational basis review in cases of discrimination based on sexual orientation.  *See Schroeder v. Hamilton Sch. Dist.*, 282 F.3d 946, 950-51 (7th Cir. 2002) ("Homosexuals are not entitled to any heightened protection under the Constitution.").  The Seventh Circuit relied on *Bowers* and *Romer* for this conclusion. Plaintiffs argue that since *Bowers* has since been overruled, the court is no longer bound by *Schroeder*.  The court disagrees and believes it is bound to apply rational basis because one of the cases the Court relied on in *Schroeder*, e.g. *Romer*, is still valid law. The court agrees with Plaintiffs that it is likely time to reconsider this issue, especially in light of the Ninth Circuit's decision in *SmithKline Beecham Corp. v. Abbott Labs*, 740 F.3d 471, 481 (9th Cir. 2014) (interpreting *Windsor* to mean that gay and lesbian persons constitute a suspect class).  However, the court will leave that decision to the Seventh Circuit, where this case will surely be headed. The court will, therefore, apply rational basis review.

### c.    Application

Defendants rely on *Johnson v. Robison* for the proposition that "when . . . the inclusion of one group promotes a legitimate governmental purpose, and the addition of other groups would not, we cannot say that the statute's classification of beneficiaries and nonbeneficiaries is invidiously discriminatory."  415 U.S. 361, 383 (1974).  According to Defendants, *Johnson* means that they must only show that there is a rational reason to provide the right of marriage to opposite-sex couples, not that there is a rational basis to exclude.  In essence, Defendants assert that the opposite-sex couples have distinguishing characteristics, the ability to naturally and unintentionally procreate as a couple, that allow the State to treat them differently from same-sex couples.

Plaintiffs, on the other hand, allege that the primary purpose of the statute is to exclude same-sex couples from marrying and thus the Defendants must show a rational basis to exclude them.  The court agrees with Plaintiffs.  According to Plaintiffs, the purpose is evident by the timing of the statute, which was passed in an emergency session near the time that DOMA was passed and immediately after and in response to a Hawaiian court's pronouncement in *Baehr v. Miike*, CIV. No. 91-1394, 1996 WL 694235 (Haw. Cir. Ct. Dec. 3, 1996), *aff'd* 950 P.2d 1234 (Haw. 1997), that same-sex couples should be allowed to marry.  *See* Family Law – Marriage – Same Sex Marriages Void, 1997 Ind. Legis. Serv. P.L. 198-1997 (H.E.A. 1265).  Because the effect of the law is to exclude and void same-sex marriages, the Plaintiffs argue that the court should analyze whether there is a rational basis to exclude same-sex marriages.  Additionally, Plaintiffs

25

assert they are similar in all relevant aspects to opposite-sex couples seeking to marry– they are in long-term, committed, loving relationships and some have children.

The *Johnson* case concerned a challenge brought by a conscientious objector seeking to declare the educational benefits under the Veterans' Readjustment Benefits Act of 1966 unconstitutional on Equal Protection grounds. 415 U.S. at 364. In reviewing whether or not the classification was arbitrary, the Court looked to the purpose of that Act and found that the legislative objective was to (1) make serving in the Armed Forces more attractive and (2) assist those who served on active duty in the Armed Forces in "readjusting" to civilian life. *See id.* at 376-377. The Court found that conscientious objectors were excluded from the benefits that were offered to the veterans because the benefits could not make service more attractive to a conscientious objector and the need to readjust was absent. *See id.* The Supreme Court found that the two groups were not similarly situated and thus, Congress was justified in making that classification. *See id.* at 382-83.

The court agrees with Plaintiffs that they are similarly situated in all relevant aspects to opposite-sex couples for the purposes of marriage. Also of great importance is the fact that unlike the statute at issue in *Johnson*, "[m]arriage is more than a routine classification for purposes of certain statutory benefits." *Windsor*, 133 S. Ct. at 2693. In fact having the status of "married" comes with hundreds of rights and responsibilities under Indiana and federal law. *See* 614 Reasons Why Marriage Equality Matters in Indiana, *Fujii*, Filing No. 46-2). As the court in *Kitchen* stated in analyzing the Equal Protection claim before it:

> [T]he State poses the wrong question. The court's focus is not on whether extending marriage benefits to heterosexual couples serves a legitimate governmental interest. No one disputes that marriage benefits serve not just legitimate, but compelling governmental interests, which is why the Constitution provides such protection to an individual's fundamental right to marry. Instead, courts are required to determine whether there is a rational connection between the challenged statute and a legitimate state interest. Here, the challenged statute does not grant marriage benefits to opposite-sex couples.[5] The effect of [Utah's marriage ban] is only to disallow same-sex couples from gaining access to these benefits. The court must therefore analyze whether the State's interests in responsible procreation and optimal child-rearing are furthered by prohibiting same-sex couples from marrying.

961 F. Supp. 2d at 1210-11 (reference and footnote added). Like Utah's laws, the effect of Indiana's marriage laws is to exclude certain people from marrying that one special person of their choosing. This is evident by the title of Section 31-11-1-1 – "Same sex marriages prohibited." Consequently, the question is whether it is rational to treat same-sex couples differently by excluding them from marriage and the hundreds of rights that come along with that marriage. *See e.g. City of Cleburne, Tex.*, 473 U.S. at 449.

The court finds that there is no rational basis to exclude same-sex couples. The purpose of marriage – to keep the couple together for the sake of their children – is served by marriage regardless of the sexes of the spouses. In order to fit under *Johnson*'s

---

[5] Section 30–1–4.1 of the Utah Code, provides:
(1) (a) It is the policy of this state to recognize as marriage only the legal union of a man and a woman as provided in this chapter.
(b) Except for the relationship of marriage between a man and a woman recognized pursuant to this chapter, this state will not recognize, enforce, or give legal effect to any law creating any legal status, rights, benefits, or duties that are substantially equivalent to those provided under Utah law to a man and a woman because they are married.
Amendment 3 provides: "(1) Marriage consists only of the legal union between a man and a woman.
(2) No other domestic union, however denominated, may be recognized as a marriage or given the same or substantially equivalent legal effect."

rationale, Defendants point to the one extremely limited difference between opposite-sex and same-sex couples, the ability of the couple to naturally and unintentionally procreate, as justification to deny same-sex couples a vast array of rights.  The connection between these rights and responsibilities and the ability to conceive unintentionally is too attenuated to support such a broad prohibition.  *See Romer*, 517 U.S. at 635.

Furthermore, the exclusion has no effect on opposite-sex couples and whether they have children or stay together for those children.  Defendants proffer no reason why excluding same-sex couples from marriage benefits opposite-sex couples.  The court concludes that there simply is no rational link between the two.  *See Tanco*, 2014 WL 997525 at * 6; *see also Bishop*, 962 F. Supp. 2d at 1290-93 (finding there is no rational link between excluding same-sex marriages and  "steering 'naturally procreative' relationships into marriage, in order to reduce the number of children born out of wedlock and reduce economic burdens on the State); *see also DeBoer*, 973 F. Supp. 2d at 771-72 (noting that prohibiting same-sex marriages "does not stop [gay men and lesbian women] from forming families and raising children.  Nor does prohibiting same-sex marriage increase the number of heterosexual marriages or the number of children raised by heterosexual parents.").

## VI.    Recognition of Out-of-state Marriages

Defendants concede that whether Indiana can refuse to recognize out-of-state, same-sex marriages turns entirely on whether Indiana may enforce Section A.  Because the court finds that Indiana may not exclude same-sex couples from marriage, the court also finds it cannot refuse to recognize out-of-state, same-sex marriages.  *See e.g. Loving*,

388 U.S. at 4, 11.  Nevertheless, the court finds that Section B violates the Equal

Protection Clause independent of its decision regarding Section A.

The parties agree that out-of-state, same-sex marriages are treated differently than

out-of-state, opposite-sex marriages.  Thus, the question is whether that difference

violates the Equal Protection Clause.  In *Windsor*, the Supreme Court concluded that by

treating same-sex married couples differently than opposite-sex married couples, Section

3 of DOMA "violate[d] basic due process and equal protection principles applicable to

the Federal Government." 133 S. Ct. at 2693.  The Eastern District of Kentucky found

two guiding principles from *Windsor* that strongly suggest the result here.  *See Bourke v.

Beshear*, No. 3:13-cv-750-H, 2014 WL 556729, * 7 (W.D. Ky. Feb 12, 2014).   First, the

court should look to the actual purpose of the law.  *Id.*  The second principle is that such a

law "demeans the couple, whose moral and sexual choices the Constitution protects."  *Id.*

(quoting *Windsor*, 133 S. Ct. at 2694).

The purpose of the law is to prevent the recognition of same-sex marriage in

Indiana, which Plaintiffs assert was motivated by animus.  If Section 31-11-1-1 was in

fact motivated by animus, it violates the principles of the Equal Protection Clause.  *See

Romer*, 517 U.S. at 633-35 ("[I]f the constitutional conception of 'equal protection of the

laws' means anything, it must at the very least mean that a bare . . . desire to harm a

politically unpopular group cannot constitute a *legitimate* state interest.") (emphasis in

original) (quoting *Dep't of Agriculture v. Moreno*, 413 U.S. 528, 534 (1973)).  Section

31-11-1-1, like DOMA, was passed during the time that Hawaii courts were deciding

whether the United States Constitution required it to allow same-sex marriages.

According to the bill's author, his "intent [was] to clarify present Indiana law and strengthen it."  Barb Albert, *Same-sex Marriage Takes Hit in Senate*, Indianapolis Star, Feb. 11, 1997, at B2.  He did not see the statute as denying rights, because he considered marriage to be a privilege, rather than a right.  *Id.*  Opponents of the bill saw it as "inflaming the biases and prejudices of individuals," "thumbing your nose" at the Constitution, and "legislat[ing] hate."  *Id.*; *see also* Stuart A. Hirsch, *Ban on Gay Marriages to go to Governor*, Indianapolis Star, Apr. 26, 1997, at B1.

Additionally, Section 31-11-1-1 is an unusual law for Indiana to pass.  As described above, in Indiana "[t]he validity of a marriage depends upon the law of the place where it occurs."  This includes recognizing marriages between first cousins despite the fact that they cannot marry in Indiana unless they are over 65 years of age.  *See Mason v. Mason*, 775 N.E.2d 706, 709 (Ind. Ct. App. 2002).  The State of Indiana chose one group to single out for disparate treatment.  The State's laws place same-sex marriages in a second class category, unlike other marriages performed in other states.  Thus, like the Supreme Court in *Windsor*, this court can conclude that this law is motivated by animus, thus violating the Equal Protection Clause.

Even if it were not, the law fails rational basis review.  Defendants proffer that the state refuses to recognize same-sex marriages because it conflicts with the State's philosophy of marriage – that is that marriage is to ameliorate the consequences of unintended children.  Recognizing the valid same-sex marriages performed in other states, however, has no link whatsoever to whether opposite-sex couples have children or stay together for those children.  Thus, there is no rational basis to refuse recognition and

30

void out-of-state, same-sex marriages.  Therefore, Part B violates the Fourteenth Amendment's Equal Protection Clause.  *See Tanco v. Haslem*, No. 3:13-cv-01159, 2014 WL 997525 (M.D. Tenn. Mar. 14, 2014); *see also Bourke*, 2014 WL 556729.

## VII.   Conclusion

The court has never witnessed a phenomenon throughout the federal court system as is presented with this issue.  In less than a year, every federal district court to consider the issue has reached the same conclusion in thoughtful and thorough opinions – laws prohibiting the celebration and recognition of same-sex marriages are unconstitutional.  It is clear that the fundamental right to marry shall not be deprived to some individuals based solely on the person they choose to love.   In time, Americans will look at the marriage of couples such as Plaintiffs, and refer to it simply as a marriage – not a same-sex marriage.  These couples, when gender and sexual orientation are taken away, are in all respects like the family down the street.  The Constitution demands that we treat them as such.  Today, the "injustice that [we] had not earlier known or understood" ends. *Windsor*, 133 S. Ct. at 2689 (citing Marriage Equality Act, 2011 N.Y. Laws 749). Because "[a]s the Constitution endures, persons in every generation can invoke its principles in their own search for greater freedom."  *Lawrence*, 539 U.S. at 579.

Therefore, the court finds as follows:

1.  The *Baskin* Plaintiffs' motion for summary judgment (No. 1:14-cv-355, Filing No. 38) is **GRANTED**;

2.  The *Baskin* Defendants' motion for summary judgment (No. 1:14-cv-355, Filing No. 55) is **DENIED**;

31

3.  The *Baskin* Plaintiffs' motion to consolidate preliminary injunction proceedings with final trial on the merits (No. 1:14-cv-355, Filing No. 37) and the *Baskin* Defendants' motion for stay of the preliminary injunction (No. 1:14-cv-355, Filing No. 68) are **DENIED as moot**.

4.  The *Fujii* Plaintiffs' motion for summary judgment (No. 1:14-cv-404, Filing No. 33) is **GRANTED in part** for all Defendants except Governor Pence and **DENIED in part** as to Governor Pence;

5.  The *Fujii* Defendants' motion for summary judgment (No. 1:14-cv-404, Filing No. 44) is **GRANTED in part** for Governor Pence and **DENIED in part** for the other Defendants;

6.  The *Fujii* Plaintiffs' motion for preliminary injunction (No. 1:14-cv-404, Filing No. 23) and motion to consolidate preliminary injunction proceedings with final trial on the merits (No. 1:14-cv-404, Filing No. 24) are **DENIED as moot**.

7.  The *Lee* Plaintiffs' motion for summary judgment (No. 1:14-cv-406, Filing No. 27) is **GRANTED in part** for all Defendants except Governor Pence and **DENIED in part** as to Governor Pence;

8.  The *Lee* Defendants' motion for summary judgment (No. 1:14-cv-406, Filing No. 41) is **GRANTED in part** for Governor Pence and **DENIED in part** for the other Defendants;

9.  The *Lee* Plaintiffs' motion for preliminary injunction (No. 1:14-cv-406, Filing No. 29), motion to consolidate preliminary injunction proceedings with final trial on

the merits (No. 1:14-cv-406, Filing No. 31), and the *Lee* Defendants' motion for extension of time (No. 1:14-cv-406, Filing No. 53) are **DENIED as moot**.

### ORDER

Pursuant to the reasoning contained above, the court **DECLARES** that Indiana Code § 31-11-1-1(a), both facially and as applied to Plaintiffs, violates the Fourteenth Amendment's Due Process Clause and Equal Protection Clause.  Additionally, the court **DECLARES** that Indiana Code § 31-11-1-1(b), both facially and as applied to Plaintiffs, violates the Fourteenth Amendment's Equal Protection Clause.  Because this is a facial challenge, same-sex couples, who would otherwise qualify to marry in Indiana, have the right to marry in Indiana.

Having found that Indiana Code § 31-11-1-1 and the laws in place enforcing such violate the Plaintiffs' rights under the Due Process Clause and the Equal Protection Clause, Defendants and their officers, agents, servants, employees and attorneys, and those acting in concert with them are **PERMANENTLY ENJOINED** from enforcing Indiana Code Section 31-11-1-1 and other Indiana laws preventing the celebration or recognition of same-sex marriages. Additionally, Defendants and officers, agents, servants, employees and attorneys, and those acting in concert with them**,** are **PERMANENTLY ENJOINED** from enforcing or applying any other state or local law, rule, regulation or ordinance as the basis to deny marriage to same-sex couples otherwise qualified to marry in Indiana, or to deny married same-sex couples any of the rights, benefits, privileges, obligations, responsibilities, and immunities that accompany marriage in Indiana.

Specifically, this permanent injunction requires the following, and the court

**ORDERS** the following:

1. The Defendant Clerks, their officers, agents, servants, employees and

   attorneys, and all those acting in concert with them, are **PERMANENTLY**

   **ENJOINED** from denying a marriage license to a couple because both

   applicants for the license are the same sex.  Thus they must act pursuant to

   their authority under Indiana Code Chapter 31-11-4 and issue marriage licenses

   to couples who, but for their sex, satisfy all the requirements to marry under

   Indiana law;

2. The Attorney General, Greg Zoeller, his officers, agents, servants, employees

   and attorneys, and all those acting in concert with them, are

   **PERMANENTLY ENJOINED** from prosecuting or assisting in the

   prosecution, using his authority from Indiana Code § 4-6-1-6, of the following:

   a. same-sex couples who fill out the current marriage license application

      where the spaces provided only allow for a male and female (Ind. Code

      §§ 31-11-11-1 and 31-11-11-3),

   b. clerks who grant the marriage licenses to qualified same-sex couples

      (Ind. Code § 31-11-11-4), or

   c. those who choose to solemnize same-sex marriages (Ind. Code §§ 31-

      11-11-5 and 31-11-11-7). .

3. William C. Vanness II, M.D., the Commissioner of the Indiana State

   Department of Health, his officers, agents, servants, employees and attorneys,

and all those acting in concert with them, are **PERMANENTLY ENJOINED** to:

    a. Act pursuant to their authority under Indiana Code § 16-37-1 to change the death certificate form to allow for same-sex spouses,

    b. Act pursuant to their authority under Indiana Code § 16-37-3 to issue death certificates listing same-sex spouses, and

    c. Act pursuant to their authority under Indiana Code § 31-11-4-4 to revise the marriage license application to allow for same-sex applicants.

4. The Commissioner of the Indiana State Department of Revenue, his officers, agents, servants, employees and attorneys, and all those acting in concert with them, are **PERMANENTLY ENJOINED** to exercise their authority under Indiana Code § 6-8.1-3 to revise the filing guidelines to allow and process joint tax returns for same-sex married couples as they do for opposite-sex married couples.

5. The Board of Trustees of the Indiana Public Retirement System and Steve Russo, the Executive Director of the Indiana Public Retirement System, and their officers, agents, servants, employees and attorneys, and all those acting in concert with them, are **PERMANENTLY ENJOINED** to administer the Pension Fund pursuant to Indiana Code Chapters 5-10.5-3, 5-10.5-4, and 5-10.5-6, so as to provide the same benefits for all married couples, regardless of whether the couples are of the opposite sex or the same sex.

This Order does not apply to Governor Pence, who the court found was not a proper party.   This Order takes effect on the 25th day of June 2014.

**SO ORDERED** this 25th day of June 2014.

_____
RICHARD L. YOUNG,  CHIEF JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsel of Record.